UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

LINDA BALDI-PERRY,

               Plaintiff,

v.

EMERSON ELECTRIC COMPANY, and                     **DECISION AND ORDER**
INSINKERATOR,
                                                  Case No. 1:22-cv-400-JLS-JJM
           Defendants.

───────────────────────────────

EMERSON ELECTRIC COMPANY AND
INSINKERATOR,

             Defendants/Third-Party Plaintiffs,

v.

TECMARK CORPORATION,

             Third-Party Defendant.

───────────────────────────────

        Before the court are the following: (1) plaintiff Linda Baldi-Perry's ("Baldi-

Perry") motion to strike defendants' expert report and exclude portions of expert testimony [47];[1]

(2) defendants Emerson Electric Company and InSinkErator's (together, "ISE") motion to

exclude expert opinions and testimony [49]; (3) third-party defendant Tecmark Corporation's

("Tecmark") motion for summary judgment [50, 51, 56]; and (4) defendants/third-party plaintiffs

ISE's motion for summary judgment [53, 54, 55], all of which have been referred to me by

District Judge John L. Sinatra, Jr. for initial consideration [5].

---

[1]      Bracketed references are to CM/ECF docket entries, and page references are to CM/ECF
pagination.

Having reviewed the parties' submissions [47, 49, 50, 51, 53, 54, 55, 56, 61, 62, 63, 64, 65, 66, 67, 70, 71, 72, 73, 74, 75], and having heard oral argument [76], the motions to exclude expert opinions and testimony [47, 49] are denied except as indicated below.[2] Tecmark's and ISE's motions for summary judgment [50, 53] will be decided at a later date.

## BACKGROUND

Baldi-Perry commenced this action alleging that she suffered severe and permanent injuries to her right hand and wrist while clearing a jam in her InSinkErator garbage disposal. Complaint [1-1], ¶¶7-9. She alleges her injury was caused by design defects as well as deficiencies in the instructions and warnings accompanying the product. Id. at 6-10.

### A.    The Subject Disposal and Switch

Following a fire in 2016, Baldi-Perry and her husband had their Buffalo home demolished and reconstructed. ISE's Statement of Material Facts [53-1], ¶2; Baldi-Perry's Opposing Statement of Facts [66-1], ¶2. Construction of the new home was completed in December 2019. [53-1], ¶3; [66-1], ¶3. As part of the project, contractors installed an InSinkErator Pro 750 Evolution Series garbage disposal in Baldi-Perry's kitchen. [53-1], ¶6; [66-1], ¶6. The disposal was installed with an optional countertop push-button control. [53-1], ¶7. The countertop push-button control was connected by an air hose to an electric switch that was installed underneath the sink. Id., ¶22.

The switch was a "dual-outlet" switch, i.e., a switch with two power outlets. Id., ¶¶22, 27. The intent of the dual-outlet feature was to allow a user to connect both a garbage

---

[2]    "Motions regarding the admissibility of expert testimony are non-dispositive". Lutz v. Kaleida Health, 2023 WL 6617737, *1 (W.D.N.Y. 2023).

disposal and an instant hot water dispenser without overloading the circuit. [53-1], ¶¶27, 32; [66-1], ¶¶27, 32; Tecmark's Statement of Material Facts [56], ¶5. In such a scenario, both devices would be plugged into the switch, but only the outlet supplying power to the hot water dispenser would be energized. [53-1], ¶¶27, 33; [66-1], ¶27; [56], ¶7. When a user pressed the countertop button, the switch would be triggered and power would be diverted from the water dispenser outlet to the other outlet powering the garbage disposal, thus activating the garbage disposal. [53-1], ¶¶27, 34-36; [66-1], ¶¶27, 35-36; [56], ¶7. When the user was finished with the garbage disposal, the user would press the button again, causing the switch to toggle power back to the outlet powering the water dispenser and de-energizing the outlet powering the disposal. [53-1], ¶37; [66-1], ¶37; [56], ¶7. At any given time, one of the outlets of the switch would be energized while the other outlet was de-energized. *See* [53-1], ¶¶27, 34-38; [66-1], ¶¶27, 35-36; [56], ¶7.

Baldi-Perry did not have an instant hot water dispenser installed. [53-1], ¶29; [66-1], ¶29. As a result, there was no such device, nor any other device, plugged into the other outlet of the switch at the time of the incident. [53-1], ¶30; [66-1], ¶30. The only device plugged into the switch at the time of the incident was the disposal. [53-1], ¶¶30-31; [66-1], ¶30.

The disposal was designed and manufactured by ISE. [53-1], ¶9. The switch was designed and manufactured by Tecmark, but the model is proprietary to ISE and sold to consumers under the InSinkErator name. [53-1], ¶¶24, 26; [66-1], ¶¶24, 26; [56], ¶8. In fact, ISE originally approached Tecmark about creating a dual-outlet switch, which Tecmark then did. [56], ¶¶1, 2, 8; [62], ¶1; [66-1], ¶25. The dual-outlet switch was approved for use with the disposal by Underwriters Laboratories ("UL"). [53-1], ¶25; [66-1], ¶25. ISE previously sold a single-outlet switch for use with disposals, but discontinued that option in 2018. [66-1], ¶27 (*citing* Timothy Kocha Deposition [66-4] at 21).

B.    **The Accident**

On December 28, 2020, during the daylight hours, Baldi-Perry was cleaning out her kitchen refrigerator after the holidays, using the disposal to dispose of food waste. [53-1], ¶¶39-40; [66-1], ¶¶39-40. At some point in this process, the disposal "jammed", that is, it stopped processing food waste despite being powered on. [53-1], ¶¶39-40; [66-1], ¶¶39-40.

After the disposal jammed, Baldi-Perry pushed the countertop button to turn off the disposal. [53-1], ¶46; [66-1], ¶46; Baldi-Perry Deposition [66-3] at 27. She then went under the sink and pushed the reset button on the underside of the disposal. [66-3] at 27. She testified that "nothing happened" as a result, so she returned to the sink and pushed the countertop button again. Id. She went under the sink again and pushed the reset button, and again "nothing happened". Id. She repeated this process "multiple times", which "didn't do anything". Id.

After that, Baldi-Perry went back to the countertop button and "made sure it was off". Id. at 27-28. She then unplugged the disposal from the switch, thinking that might reset the disposal. Id. at 28-29. She recalled that the disposal had been plugged into the bottom outlet of the switch. Id. at 29. She again pressed the reset button and "nothing happened". Id. at 28. She plugged the disposal back into the switch. Id. She did not recall which outlet she plugged the disposal back into. Id. at 31. She then took the "unjamming tool" and inserted it into the disposal.[3] Id. at 28. She was able to turn the tool, and she believed the clog was breaking up. Id. Immediately after, the disposal "turned itself on", pulling the tool and Baldi-Perry's wrist around the bottom of the disposal. Id. The unjamming tool then "flew off", hitting Baldi-Perry's thumb, fracturing it, and injuring her wrist. Id.

---

[3]    The "unjamming tool" Baldi-Perry refers to is the "Jam-Buster Wrench", which is essentially a 1/4-inch Allen wrench provided by InSinkErator for the purpose of clearing jams. [53-1] at 12-13.

Baldi-Perry had a copy of the disposal manual next to her as she attempted to clear the jam. [53-1], ¶¶74-76; [66-1], ¶¶74-76. Baldi-Perry's husband and sister were in the kitchen with her at the time of the incident. [53-1], ¶41; [66-1], ¶41. They each had little recollection of Baldi-Perry's efforts to clear the jam prior to her injury. *See* Cheryl Ann Baldi Deposition [47-5] at 1-3; Robert Johnson Perry Deposition [47-6] at 19. There was no music or radio playing in the kitchen, but there was television in the kitchen that may have been on "in the background". [53-1], ¶¶42, 44; [66-1], ¶¶42, 44. The volume would have been low enough to allow for "casual conversation" among the occupants of the kitchen. Id.

## C.    ISE's Expert Dr. Knox

ISE provided the first of two expert reports from Erick H. Knox, Ph.D., on March 1, 2024. [47-2].  In that report, Dr. Knox states he was retained to "perform a technical accident investigation and engineering analysis". Id. at 4. As part of his analysis, Dr. Knox conducted auditory and tactile testing of the disposal. Id. at 19. He opined that the sound of disposal when it was powered on and "jammed" was sufficient to alert "a reasonably attentive person in the near vicinity" that the disposal was energized. Id. at 31. He found likewise that "the vibrations that would have been felt" at the bottom of the disposal "would provide a strong tactile cue to a reasonably attentive person that the disposal was energized". Id.

## D.    Baldi-Perry's Expert Dr. Ketchman

In a February 2, 2024 report, Jeffrey Ketchman, EngScD., P.E, opined that, based on his review of numerous documents and "[his] education and professional experience in engineering, accident reconstruction, and the safety and design of industrial and consumer products", the disposal had the following design defects: (a) it failed to include safety warnings

and instructions on the disposal itself; (b) it failed to provide any safety warnings or instructions

on the "Jam-Buster Wrench";  and (c) the "switch accessory" failed to include a switch that

would turn off power to its dual outlets and a visual indication. Ketchman Report [49-4] at 1, 16.

He further opined that the instruction manual was defective because it was not

organized with safety instructions first; did not include a section on clearing jams; did not

provide adequate instructions for clearing jams; and did not include installation instructions. Id.

Finally, he opined that the switch accessory's instructions and warnings were defective because

they were not organized with sections for safety, operation, and installation; did not provide

adequate instructions for use when clearing jams in the disposal; did not adequately warn users

of potential hazards associated with the alternating outlet powering function; and failed to

instruct the user to save the instructions. Id. In reaching these conclusions, Ketchman cited the

concept of "Safety Design Hierarchy", which he defines as "a structured approach that prioritizes

the elimination of hazards when possible and, when not, employs the best practical means to

protect the user". Id. at 10.

## DISCUSSION

### A.    Plaintiff's Motion to Strike and Exclude

Baldi-Perry argues that Dr. Knox's first report should be excluded because his

opinions are not based on his expertise, knowledge, or experience, and are unreliable and

irrelevant. [47-7] at 2. She argues that because Dr. Knox is not a sound engineer or an acoustic

engineer, nor has any training in auditory or vibrational testing, he is not qualified to opine on

the decibel levels of the disposal or the tactile clues it would have provided. Id. at 8. She further

argues that Dr. Knox's opinion is unreliable and irrelevant because it did not recreate all the

relevant circumstances on the day of the injury, such as background noise from the television,

plaintiff's position relative to the disposal, and the layout of plaintiff's sink and cabinet.  Id. at 9-14.

An expert witness may offer testimony if it is demonstrated by a preponderance of the evidence that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. ("Rule") 702; United States v. Jones, 965 F.3d 149, 161 (2d Cir. 2020). "The fundamental requirements are . . . that [the proposed expert] evidence be relevant and reliable". Jones, 965 F.3d at 161.

"Rule 702 embodies a liberal standard of admissibility for expert opinions, representing a departure from the previously widely followed, and more restrictive, standard of Frye." Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005) (citing Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923)). "There is a presumption that expert evidence is admissible, and 'the rejection of expert testimony is the exception rather than the rule'." Chen-Oster v. Goldman, Sachs & Co., 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015) (quoting Fed. R. Evid. 702 advisory committee's note (2000))

### 1.  Dr. Knox's Qualifications

"Rule 702 requires a trial court to make an initial determination as to whether the proposed witness qualifies as an expert." Baker v. Urban Outfitters, Inc., 254 F. Supp. 2d 346, 352 (S.D.N.Y. 2003). "In considering a witness' practical experience and educational background as criteria for qualification, the threshold question is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth."

Hilaire v. DeWalt Industrial Tool Co., 54 F. Supp. 3d 223, 235 (E.D.N.Y. 2014). "Even if a proposed expert lacks formal training in a given area, he may still have 'practical experience' or 'specialized knowledge' qualifying him to given opinion testimony under Rule 702." Lickteig v. Cerberus Capital Management, L.P., 589 F. Supp. 3d 302, 328 (S.D.N.Y. 2022) (citation omitted).

"Any one of the qualities listed in Rule 702 - knowledge, skill, experience, training, or education - may be sufficient to qualify a witness as an expert." Crown Cork & Seal Co., Inc. Master Ret. Tr. v. Credit Suisse First Boston Corp., 2013 WL 978980, *2 (S.D.N.Y. 2013). "Thus, an expert 'should not be required to satisfy an overly narrow test of his own qualifications,' and . . . '[a]ssertions that the witness lacks particular educational or other experiential background, go to the weight, not the admissibility, of the testimony." American Empire Surplus Lines Insurance Co. v. J.R. Contracting & Environmental Consulting, Inc., 2024 WL 3638329, *5 (S.D.N.Y. 2024).

Dr. Knox has a Ph.D. in biomedical engineering. [63-1], ¶7. His academic work included the topics of sensory physiology, human sensation, natural and artificial reflexes, and other topics related to biomedical engineering and human factors such as hearing, touch, vision, kinesthetics, and ergonomics. Id., ¶¶8-11. In his 28-year professional career, he participated in "over one thousand" investigations involving consumer products and residential environments and "hundreds" of projects involving human perception and reaction to various sensory inputs such as sound and touch, as well as measuring and quantifying sound and vibration. Id., ¶¶17-20.

Plaintiff correctly points out that Dr. Knox is neither a "sound engineer" or an "acoustic engineer". [47-7] at 8. However, it is clear to me that Dr. Knox has sufficient knowledge, skill, experience, training, and education relevant to the topics upon which he opines

in his March 2024 report, specifically the relationship between human perception and the sound and vibrations produced by a jammed Disposal. *See* Knox Report [47-2] at 31. Further, while the testing performed by Dr. Knox doubtlessly touches on several disciplines, I disagree with plaintiff's assertion ([47-7] at 8-9) that Dr. Knox's conclusions exceed the scope of his qualifications or pertain to matters completely outside his field. *See, e.g.,* Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 82 (2d Cir. 1997) ("[the] interaction between people and machinery is clearly of the sort that [the expert] has worked with in depth"); Beer v. AGCO Corp., 2014 WL 12606149, *4 (E.D. Pa. 2014) (finding a mechanical engineer with fifteen years' experience teaching human factors and accident reconstruction qualified to opine on the noise level of a machine and a person's ability to hear).

## 2. Reliability and Relevance

"Once a court has determined that a witness is qualified as an expert, it must next ensure that the expert's testimony both 'rests on a reliable foundation and is relevant to the task at hand'." 523 IP LLC v. CureMD.Com, 48 F. Supp. 3d 600, 643 (S.D.N.Y. 2014) (*quoting* Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993)). In determining reliability, "the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" Amorgianos v. National Railroad Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002). Regarding relevance, the question is "whether the proposed expert testimony 'will help the trier of fact to understand the evidence or to determine a fact in issue.'" Washington v. Kellwood Co., 105 F. Supp. 3d 293, 308 (S.D.N.Y.

2015) (*quoting* Fed. R. Evid. 702). In both respects, the analysis is flexible, and there is presumption in favor of admissibility. *See* id. at 306-08.

        Plaintiff argues that Dr. Knox's opinion is unreliable and irrelevant because it did not recreate all the relevant circumstances on the day of the injury, such as background noise, plaintiff's position relative to the disposal, and the layout of plaintiff's sink and cabinet. [47-7] at 9-14. Plaintiff points to testimony from Cheryl Ann Baldi, who was present in the kitchen at the time, indicating that she was "casually" talking to Baldi-Perry while she was attempting to unjam the disposal. *See* Cheryl Ann Baldi Deposition [47-5] at 17.[4] Plaintiff also notes that she was in several different positions relative to the disposal in the course of attempting to unjam it, not all of which were accounted for in Dr. Knox's testing. [47-7] at 11-12. Finally, plaintiff takes issue with differences in the layout of Dr. Knox's test cabinet and sink, namely that the test disposal unit may have been newer than the subject disposal, the test sink was a double sink rather than a single, and the test disposal was nearer to the wall than the subject disposal was. Id. at 12.

        "A party wishing to introduce an experiment for litigation must show 'a substantial similarity' between the experiment and the actual conditions of the claim". Starter Corp. v. Converse, Inc., 170 F.3d 286, 297 (2d Cir. 1999). "However, perfect identity between experimental and actual conditions is neither attainable nor required." Guild v. General Motors Corp., 53 F. Supp. 2d 363, 366 (W.D.N.Y. 1999). Dr. Knox's testing, by his own admission,

---

[4]     Plaintiff's initial brief suggested that a Buffalo Bills football game might have been on the television in the kitchen, under the mistaken impression that the game was on at 1:00 p.m. that day. ([47-7] at 11). Plaintiff later concedes that game (a 38-9 drubbing of the New England Patriots) actually started at 8:15 p.m. that evening. [53-1], ¶43; [66-1], ¶43. There further seems to be no reason to conclude that the television was on at all, as none of the three occupants of the kitchen specifically recalled or noted the TV being on. *See* Cheryl Ann Baldi Deposition [47-5] at 1; Robert Johnson Perry Deposition [47-6] at 1-2; Baldi-Perry Deposition [53-3] at 22 (was not asked, but also did not note).

"was not done to reconstruct Ms. Baldi-Perry's incident, but was instead done for the purpose assessing and documenting the sound and vibration sensory inputs available to a person near the disposal when it is powered on in a jammed condition." Knox Report [47-2] at 19.

As Dr. Knox suggests, an expert's experiment does not need to completely recreate all the conditions of the date of the incident to provide useful information for the trier-of-fact. *See* Druzba v. American Honda Motor Co., 2024 WL 2211887, *9 (D. Vt. 2024) ("[the expert] did not intend to recreate the Accident in his FEA simulations but instead analyzed 'how the vehicle reacts under one condition'"); Rich v. Tee Bar Corp., 2013 WL 5442277, *3 (N.D.N.Y. 2013) ("[t]he purpose of the experiment was not to exactly reconstruct the conditions on the day of the accident, but to demonstrate the effect that pushing and flinging would have on the distance traveled by a tuber"). In my view, Dr. Knox's experiment satisfies its intended purpose and provides potentially useful information to the eventual trier-of-fact about whether the disposal would have provided auditory or tactile cues to the user that it was energized despite being jammed. [5]

Moreover, a district court "should [only] exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison," and "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony."

---

[5]    The First Circuit cases cited by plaintiff are distinguishable. *See*, *e.g.*, Bogosian v. Mercedes-Benz of North America, Inc., 104 F.3d 472, 479 (1st Cir. 1997) (holding that "[plaintiff's expert] did not, in any way, attempt to replicate the known facts surrounding the injury-producing event", including contradicting plaintiff's own "unwavering testimony" as to the status of product).

Zerega Avenue Realty Corp. v. Hornbeck Offshore Transportation, LLC, 571 F.3d 206, 214 (2d Cir. 2009) (cleaned up).

Plaintiff's objections have to do with the conditions and limitations of Dr. Knox's experiment rather than its foundational, technical, or scientific underpinnings, and thus are firmly in the latter category. The Supreme Court has explained that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. For all these reasons, plaintiff's motion to exclude [47] is denied.

**B.    Defendants' Motion to Strike the Ketchman Report**

ISE seeks to exclude the testimony and opinions of plaintiff's expert Dr. Ketchman. [49-1] at 6. They argue that Dr. Ketchman's opinions, which allege a design defect in the push-button switch accessory as well as deficiencies in the accompanying instructions and warnings, are inadmissible as unreliable and unconnected to existing data. Id.

Dr. Ketchman's February 2, 2024 report opines that the Disposal had the following defects: (a) it failed to include safety warnings and instructions on the disposal itself; (b) it failed to provide any safety warnings or instructions on the "Jam-Buster Wrench"; and (c) the "switch accessory" failed to include a switch that would turn off power to its dual outlets and a visual indication. Report [49-4] at 16.[6] He also took issue with the organization of the instruction manuals for the disposal and switch and the adequacy of the warnings therein. Id.

---

[6]    Dr. Ketchman also opined as to alleged design defect in the subject disposal itself ([49-4] at 16), but plaintiff has withdrawn that claim. [66] at 5, n. 3.

ISE argues that Dr. Ketchman's testimony is inadmissible because his opinions as to design defect, product instructions, and warnings have not been tested or subject to peer review, and that his opinions are connected to existing data only by his own *ipse dixit*. [49-1] at 19-30.[7] They point out that Dr. Ketchman, by his own admission, did not inspect the subject disposal or switch; did not test the disposal or switch; and did not prepare nor test any alternative designs for the disposal or switch. [49-1] at 12, 23. Dr. Ketchman, as the bases for his opinions, cites broadly to his expertise, "industry norms", and the concept of "safety design hierarchy". [49-4] at 10.

As discussed above, the court must determine "whether the proffered [expert] testimony has a sufficiently 'reliable foundation' to permit it to be considered." Daubert, 509 U.S. at 597. The "indicia of reliability" include "(1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" Amorgianos, 303 F.3d at 265. Additional factors to consider are "(1) whether a theory or technique has been or can be tested; (2) 'whether the theory or technique has been subjected to peer review and publication;' (3) the technique's 'known or potential rate of error' and 'the existence and maintenance of standards controlling the technique's operation' and (4) whether a

---

[7]    Defendants do not argue, at least at this time, that Dr. Ketchman is unqualified to offer expert opinion. [49-1] at 18, n. 8. Defendants merely point out that Dr. Ketchman, despite his impressive resume ([49-4] at 19-21), has no specific experience regarding the design of garbage disposals or their accessories. *See* [49-1] at 9-10. For purposes of resolving the current motions, I assume that Dr. Ketchman is qualified. *See* Humphrey v. Diamant Boart, Inc., 556 F. Supp. 2d 167, 176 (E.D.N.Y. 2008) (finding Dr. Ketchman qualified despite his lack of expertise with the particular product at hand).

particular technique or theory has gained general acceptance in the relevant scientific community". United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007) (*quoting* Daubert, 509 U.S. at 593-94). However, the applicability of any or all of these factors depends on the context. *See* Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999) ("whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine. . . . [T]he gatekeeping inquiry must be tied to the facts of a particular case"); Amorgianos, 303 F.3d at 266.

### 1. Alleged Design Defect

In his report, Dr. Ketchman concludes that the design of the dual-outlet switch was defective because it left ambiguous to the user which of the two outlets was energized, as the push-button switch only alternated which outlet was energized rather than de-energizing the entire unit, and there was no visual indication which of the two outlets was energized at any given time. [49-4] at 14-15. He opined that a safer design would include a marked on/off switch that disconnects power to the entire unit. Id. at 15. Dr. Ketchman admits he conducted no testing in support of his opinion, and that there are no applicable industry standards. Ketchman Deposition [67-4] at 12-14.

Typically, an expert proponent of an alternative design must show that such a design is feasible, either by testing and constructing a prototype, or by "identify[ing] makers of similar equipment who have already put into use the alternative design that has been proposed". Rypkema v. Time Manufacturing Co., 263 F. Supp. 2d 687, 692 (S.D.N.Y. 2003). "While testing is not an 'absolute prerequisite' for an expert's theory of . . . alternative design to be admissible in a design defect case, it is usually critical to show that an expert 'adhered to the same standards of intellectual rigor that are demanded in their professional work.'" Colon ex rel. Molina v. BIC

USA, Inc., 199 F. Supp. 2d 53, 76 (S.D.N.Y. 2001) (citation omitted); *see* Benjamin v. Fosdick

Machine Tool Co., 2015 WL 1822669, *3 (W.D.N.Y. 2015). Other cases suggest that "drawings,

models, and calculations" which are "rooted in reliable scientific reasoning and methodology"

may suffice in lieu of real-world testing. Miller v. Sportsman's Guide, LLC, 2024 WL 1683842,

*9, adopted 2024 WL 1678072 (W.D.N.Y. 2024).

        Dr. Ketchman's report fails to supply any of these examples of professional rigor.

*See* [49-4] at 15. He states merely that "[h]ad the module been designed in this a [sic] way there

is no doubt Linda would have turned the module off while she was attempting to clear the jam

and this incident would not have occurred". Id. Dr. Ketchman was aware of the need to

demonstrate feasibility, as he has done in other cases. *See* Humphrey, 556 F. Supp. 2d at 178

("testing is not required to establish feasibility if the expert can point to an existing design in the

marketplace, which Ketchman in fact did"). Seemingly in recognition of this shortcoming,

plaintiff submits a Declaration from Dr. Ketchman that includes explicit references to two other

disposal switches existing in the marketplace. [66-20] at ¶¶11, 12. One is a Moen Garbage

Disposal Air Switch Controller, and the other is an Electop Garbage Disposal Switch Kit. Id.

Notably, both of these options are single-outlet switches. *See* id.; [67-21] at 2-3; Garbage

Disposal Wireless Switch Kit, ELECTOP, Amazon.com, https://www.amazon.com/dp/

B0B3XLGQ84 (last visited January 7, 2025).

        There are two problems with Dr. Ketchman's Declaration. First, it is improper to

consider this showing of feasibility that is offered for the first time in opposition to the motion to

strike. "Under Rule 26(a)(2) . . .  an expert witness must prepare a written report that contains,

among other things, 'a complete statement of all opinions the witness will express and the basis

and reasons for them'; the expert witness must do so 'at the times and in the sequence that the

court orders.'" In re Bear Stearns Co., Inc., 263 F. Supp. 3d 446, 451 (S.D.N.Y. 2017). "When a party fails to make a necessary disclosure under FRCP 26(a) or (e), 'the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Id. (citing Fed. R. Civ. P. 37(c)(1)); see also Sandata Technologies, Inc. v. Infocrossing, Inc., 2007 WL 4157163, *6 (S.D.N.Y. 2007) ("experts are not free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon, or to continually supplement their opinions."). In this case, the final deadline for expert discovery was May 31, 2024. See Amended Case Management Order [42] at 2. Dr. Ketchman's Declaration was submitted on November 12, 2024, which is well beyond that deadline.

Secondly, the single-outlet switches cited by Dr. Ketchman are a somewhat different product than the switch. A plaintiff "cannot satisfy his burden to propose a feasible alternative design by proposing that an entirely different product could have been used". Hilaire v. DeWalt Industrial Tool Co., 54 F. Supp. 3d 223, 248 (E.D.N.Y. 2014). A single-outlet switch lacks the functionality that was the impetus for creating the dual-outlet switch, i.e., the ability to toggle power between two devices on the same circuit. See Oden v. Boston Scientific Corporation, 330 F. Supp. 3d 877, 889 (E.D.N.Y. 2018) (rejecting a proposed feasible alternative design where "the design and purpose of the[] two products is different"). "Under New York law, a manufacturer cannot be held liable for failing to adopt an alternative product design that has not been shown to retain the 'inherent usefulness' the product offers when manufactured according to the more risky (but otherwise lawful design) that was actually used." Rose v. Brown & Williamson Tobacco Corp., 53 A.D.3d 80, 82 (1st Dept. 2008); see Pinello v. Andreas Stihl Ag & Co. KG, 2011 WL 1302223, *16 (N.D.N.Y. 2011).

-16-

Dr. Ketchman's report does not suggest the use of a single-outlet switch; rather, it opines that the switch - as it exists - should have had "a switch that would turn off power to its dual outlets". [49-4] at 16. His contention that a single-outlet switch would have been sufficient for Baldi-Perry's purposes has some commonsense appeal, but it was not a contention he made in his report. Nor did he delve into any discussion of the comparative risk-utility between a dual-outlet switch and any single-outlet alternative. As a result, ISE was unable to question Dr. Ketchman as to whether these single-outlet switches were feasible alternatives or to present rebuttal evidence. Therefore, I agree with ISE that the proposed alternative designs offered in Dr. Ketchman's Declaration should be stricken.[8]

As for whether his report itself should be stricken, I again defer to the general rule that a district court "should [only] exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison". Zerega Avenue, 571 F.3d at 214. Dr. Ketchman's opinion that the addition of marked on/off switch to the switch would have prevented this accident incorporates some important unexplained assumptions, chiefly that it was feasible to add such a switch and that a user would be likely to use it, but such assumptions do not strike me as wildly unrealistic or contradictory. See, e.g., In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation, 2022 WL 15053250, *33 (E.D.N.Y. 2022) (finding that certain "reasonable assumption[s]" underlying an expert's opinion do not render the opinion unreliable). Those assumptions can, in the usual course, be tested on cross-examination. See id. For these

---

[8]    To clarify, I am not expressing any opinion on whether these proposed single-outlet alternatives could be considered feasible alternative designs. I am simply concluding that plaintiff's expert should not be allowed to testify about these proposed alternatives or their feasibility, and that the statements in the Declaration should be stricken.

reasons, I will not strike Dr. Ketchman's report in its original, unsupplemented form. Whether or not the report is ultimately sufficient, along with the remainder of the proof, for Baldi-Perry to avoid summary judgment on the issue of design defect is a separate issue that will be addressed at a later date.

### 2.  Alleged Failure to Warn

ISE makes similar arguments in favor of excluding Dr. Ketchman's opinions as to the adequacy of warnings accompanying the disposal and switch. [49-1] at 25-27. Dr. Ketchman's report included a list of suggested additions and revisions, including the addition of safety warnings and instructions on the disposal and the "Jam-Buster Wrench" themselves, as well as taking issue with the organization and contents of the accompanying instruction manual. Report [49-4] at 16. ISE argues that Dr. Ketchman did not test his proposed "candidate" warnings, for example through use of focus groups, peer review, or other "comprehensive analysis". [49-1] at 25-27.

Again, I review the admissibility of expert evidence through the lens of presumptive admissibility (Chen-Oster, 114 F. Supp. 3d at 115), mindful of the "fundamental requirements" of reliability and relevance. Jones, 965 F.3d at 161. "Under New York law, 'a manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known.'" Mattheos v. JLG Industries, Inc., 2024 WL 3835174, *5 (E.D.N.Y. 2024) (citation omitted). "[L]iability for failure to warn may be imposed based upon either the complete failure to warn of a particular hazard or the inclusion of warnings that are insufficient." Id. (quoting Almonte v. Averna Vision & Robotics, Inc., 128 F. Supp. 3d 729, 752 (W.D.N.Y. 2015)).

To this end, two points raised by Dr. Ketchman's report seem particularly salient. First is that, among the "IMPORTANT SAFETY INSTRUCTIONS" provided by ISE with the disposal, is an instruction to "[t]urn the power switch to the off position before attempting to clear a jam". [49-4] at 12. Dr. Ketchman opines that this instruction cannot literally be followed, as the switch has no designated on/off position, and pressing the countertop button does not actually disconnect power to the switch (*i.e.*, it only toggles power between the two outlets). Id. While additional testing or review into the issue of whether this instruction was understandable as written could have been appropriate, the issue of whether the instruction described a physical impossibility from a technical standpoint is a matter that is safely within Dr. Ketchman's training and experience to opine upon. *See* Liriano v. Hobart Corp., 949 F. Supp. 171, 177 (S.D.N.Y. 1996) (finding a testing requirement inapplicable where expert testimony is based on a matter of experience or training).

The second point, closely related to the first, is made in reference to another set of instructions: the "USER MAINTENANCE INSTRUCTIONS, RELEASING DISPOSER JAM". [49-4] at 13. Here, the user is instructed "[t]o release jam: (1) Turn off disposer and water". Id. Dr. Ketchman opines that this instruction is inadequate, and quotes alternative warnings from competitors that instruct users to "[u]nplug the power cord before attempting to clear a jam" or to both "[t]urn off the disposer and then power off". Id. Thus, he has affirmatively identified alternative warnings that exist in the marketplace, which, as we have discussed, is an accepted demonstration of "intellectual rigor" in the absence of testing. *See* Benjamin, 2015 WL 1822669 at *3. While Dr. Ketchman is not forthcoming about which "major competitors" he is quoting ([49-4] at 13), that can be clarified on cross-examination.

The remainder of Dr. Ketchman's observations and "candidate warnings", including the attachment of warnings to the disposal and the unjamming tool, arguably demonstrate less professional rigor. [94-4] at 11-16. However, these suggestions are closely related to the points discussed above, that is, that ISE failed to communicate clearly to the user the need to disconnect power to disposal for attempting to clear a jam. In any event, the focus of the jury's inquiry at trial is not the particulars of any warnings suggested by plaintiff but "[t]he adequacy of the instruction or warning" that was actually provided to the consumer. Urena v. Biro Manufacturing. Co., 114 F.3d 359, 366 (2d Cir. 1997).

For these reasons, ISE's motion to exclude Dr. Ketchman's opinion as to the adequacy of the warnings accompanying the disposal and switch is denied.

## CONCLUSION

For the reasons above, plaintiff and ISE's motions to exclude expert opinions and testimony [47, 49] are both denied, except that Dr. Ketchman's statements in his Declaration regarding proposed alternative designs are stricken and any testimony to that effect is precluded.

Dated:  February 25, 2025

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge